All rise. The United States Court of Appeal for the Federal Circuit is now open and in session. God save the United States and its honorable members. Thank you. Be seated. Good afternoon. The first case this afternoon is number 05-1512, Cities of Burbank and Others against the Department of Energy. Mr. Wiggins. May it please the courts, the city's appeal to this court to reverse the opinions of the Department of Energy board of contract appeals on the city's count 1 and count 2 claims. The board's opinion on count 1 erroneously disregards the clear and unambiguous contract language that supports the city's count 1 claim in violation of standard rules of construction of contracts. Count 1 involves only questions of law that are reviewed de novo by this court under the applicable terms of the CDA. The board's opinion on count 2 arbitrarily and capriciously ignores conclusive evidence that supports the city's count 2 claim. It thereby fails the substantial evidence test on the city. Mr. Wiggins. Please proceed directly to your strongest arguments. I certainly will. Mr. Wiggins, I guess the entire issue that we're looking at is whether or not the Bonneville Power could unbundle costs from one rate to another. So if the PF rate basically was an unbundled rate when you first started out and later it became an unbundled rate, what elements were different from the bundled to the unbundled rate, if any? The elements that were unbundled from the previously bundled PF rate were a charge for load shaping, so that after it was unbundled, not all of the PF customers paid that charge, only the ones that took that service. Load regulation was also unbundled from the PF rate, so that only the PF customers who took that service paid that charge. All transmission charges were moved into a separate rate schedule, a transmission rate schedule. There were three transmission charges that BPA added back into the PF rates when it adjusted the city's contract prices in 1996. The base charge, the transmission load shaping charge, and the delivery charge. Delivery charge is for low voltage delivery. Those were the charges that were unbundled from BPA's PF rate. Were they previously included? They were previously included, yes. So what difference does it make? Is it still looking at apples and apples and oranges and oranges? That's not the issue here. What did the contract say? The contract ties changes in the city's prices to changes in the PF rates. Contract language is very clear. It's very unambiguous. It does not say all of the charges that the preference customers and the exchange customers pay. It says the PF rates. Now, in this case, we have two counts. In count one, we're challenging the inclusion of these other charges in the 1996 contract price adjustment. In count two, we're challenging the inclusion of the PF exchange rate. Now, count two arises because in order to obscure the fact that BPA has two very different classes of customers to whom the PF rate applies. It has the preference customers on the one hand, and it has the exchange customers on the other hand. And in certain circumstances, their rates move in entirely opposite directions. But isn't the PF rate really a blended rate, the average of the preference and the exchange rates? The PF rate is listed in Bonneville's PF 96 rate schedule as the charges for priority firm power. Remember, PF rate is defined in the agreements. We're dealing with a negotiated contract here. The definition of PF rate in subsection 983 of the agreements is Bonneville's priority firm power rate. But the contract expressly says if there's more than one PF rate, you're going to average them together. That's exactly what they did. That comes up in count two as opposed to count one. Yes. That's where I think you are, isn't it? Well, I'll go there if you want me to go there. In count two, the problem is the parties didn't specify in the agreement if they were talking about the PF rate for the preference customers or the PF rate for the exchange customers. Now, late in the negotiations, Mr. Yeider, the representative of Burbank in the negotiations with Bonneville, asked Bonneville if the PF rate referred to in subsection 983 is the PF rate for preference customers. And Bonneville's negotiator, Mr. Hanlon, answered, yes, it is. He did not say anything about PF exchange customers or a PF exchange rate. So Bonneville actually confirmed the city's interpretation that the PF rate applied to the preference customers only, which is what it had always done. Was there any objection by the cities at that point? Objection to what? To the calculation. The cities objected in 1996 to the calculation. Well, Mr. Heider again testified, as you pointed out, that he noted the exclusion of the exchange rate in the calculation of the PF rate. But because the preference and the exchange rates were both, quote, the same, it didn't seem to matter much. So at that point, it didn't matter much at all in 95. 95 didn't matter at all because the rates were exactly the same. So it's true. He did not raise an objection to it at that point. So there was no objection by Mr. Heider. For three years, right? It was immaterial. There were two adjustments prior to 96. There was no objection because it had no material impact. And the cities had the protection of the waiver of default clause. So you're not relying on any theory of mutual mistake. And I gather your position is that there's not an issue here of waiver. Our position is that Bonneville acquiesced in the city's interpretation that the PF rate to be used was the PF rate for the preference customers only at the time of contract formation. Because it confirmed the city's interpretation and then it signed the agreements without clarifying that it had a different interpretation. Now in 1993 and 95, there were adjustments of the city's contract prices that came up. Bonneville did include the PF exchange rate in those two adjustments. It was immaterial. It didn't have any negative impact on the city's contract prices. They had other issues that they were discussing. The parties were trying to make the contract work. There was nothing to object to because there wasn't any overcharge. So it's true that they did not object. But the cities have a non-waiver clause. Now this court has previously held in May of last year in the Westpac holdings in the United States case that even the acceptance of benefits in the millions of dollars, hundreds of millions of dollars from the government, when there is a reservation of right, does not waive the non-breaching party's rights to contest the breach. Our position is the city simply did not object to the 1993 and 95 contract price adjustments. But because of the waiver of default clause in the agreements, they preserved their right prospectively to raise the issue of Bonneville's inclusion of the PF exchange rate in the price calculation when it had a material impact. That's on count two. Back on count one. The board's count one opinion relies entirely on a general principle set forth in a single case, the Alvin Limited versus U.S. Postal Service case. It's the only precedent that the board cites. However, the board does not apply the analysis used in that case, which is clearly distinguishable. In Alvin, the court held that the U.S. Postal Service was obligated under its lease to pay new special assessments which replaced real property taxes as a result of a change in state law, in particular the enactment of Proposition 13 in California. In Alvin, it was the change in state law occurring well into the contract term that triggered the need to discern the party's intent with respect to the Postal Service's contractual obligation to pay general real estate taxes. In the case at Barr, there is no finding that BPA's removal of the unbundled charges for the PF rates was mandated by any change in law, as in Alvin. It was not. It was the result of a business decision by BPA. The board failed to commence its inquiry by considering whether the contract price adjustment provision in subsection 983 of the agreements is clear and unambiguous. Mr. Williams, doesn't the BPA have to publish their notice of rates and go through a hearing and notice of provision? Yes, they do. Isn't that sufficient, really, to put everybody on notice as to what they're doing? This is not a standard type of a public utility that we're talking about. It's a government agency. Again, what I come back to is the fact that on the eve of signing the agreements, the cities inquired of BPA. Is the PF rate to be used in the contract price adjustment clause, the PF rate for the preference customers, and Bonneville confirmed that it was. Now, both parties assume that the other party is negotiating in good faith. They're exchanging information. Once BPA has confirmed to the cities that, yes, that is the rate for the preference customers, which is what the cities were bargaining for, the cities had no reason to doubt BPA's word and to go behind their backs and investigate in their own case whether, in fact, that was true or not, because the issue was only going to come up in 1993 when the first contract price adjustment was referred. So the cities relied on BPA's confirmation that the PF rate was the rate for the preference customers. With all due respect, it's very easy for non-lawyers negotiating an agreement, as was the case here, to confuse the term PF rate with the word preference rate. Bonneville can call that rate whatever it wants. It can call it priority firm. It can call it freight. The question is, does it apply to the preference customers? The cities asked the question. Bonneville confirmed, yes, it does. That's the rate for the preference customers. The cities were satisfied. They handed in to the agreement on that basis. Now to go back to the count one argument, which has to do with the unbundling of the charges that Bonneville voluntarily removed from its PF rates. Now if the parties had spelled out in the agreements, as frankly the cities wished they had, that what the city's contract price was tracking was the rates that the preference customers paid, we wouldn't be having this dispute. But that issue was obscured by the language used by – suggested by BPA in the price adjustment clause, which only refers to the PF rate. And that's all that it refers to. PF rate is defined in the agreement as Bonneville's priority firm power rate. Not all the charges in the PF rate schedule, but the Bonneville priority firm power rate. And the Bonneville priority firm power rate is the only rate that all Bonneville PF customers pay. Some of them pay load shaping in addition to that. Some of them pay load regulation in addition to that. They pay various types of transmission in addition to that, but that is the only PF rate that they all pay, which is why it alone is the PF rate. Other charges are for other services. The agreement contains no proviso that says provided that the PF rate will always be tracking the same cost components. It's the PF rate, whatever that is, which means that the cities took the risk that new things could be added to that PF rate. For example, the requirement to install fish ladders on the Columbia River system to comply with new environmental requirements. That was a risk that the cities took, that these costs would be added to the PF rate. Bonneville took the risk that the PF rate would be lower in the future in relation to market rates. But the PF rate, whatever it is, that was the deal. But I'm still puzzled, Mr. Williams, as to whether or not the PF rate that was part of the contract included all of those elements, all of those charges. It did include all of those charges before, and they were bundled. At the outset, everything was bundled. So, for example— So, excuse me, if in fact Bonneville would not unbundle the charges, then it would not be a problem. If they had not unbundled the charges, again, the deal is whatever the PF rate is, that's what will be used in the contract price adjustment. So, if in fact they added some additional charges to the PF rate and didn't unbundle them, it wouldn't be a problem. Is that what you're saying? That's exactly right. You would not have to fight that. We would not have a bone to pick with BPA in that case. Or a ladder to climb. Do you want to save your rebuttal time, or is there anything else you want to tell us now? I'll just wrap up by saying that on count one, the Board committed reversible error by ignoring the analysis in the only precedent it cites, the Alvin case, which is clearly distinguishable, by failing to apply the clear and unambiguous language of the contract price adjustment clause in subsection 983 of the agreements, and by misinterpreting that language and the similarly clear and unambiguous language of BPA's 1996 rate schedules. In count two, the Board committed three reversible errors. First, it failed to consider the contract price adjustment clause in its entirety and in context, and held that the definition of PF new was unambiguous based solely on the last sentence thereof in isolation. That was not correct at all. Second, it arbitrarily and preposterously ignored the uncontroverted conclusive evidence produced at the hearing that BPA confirmed the city's interpretation of the PF rate for purposes of the contract price adjustment clause as the PF rate for preference customers, and acquiesced in that interpretation. That error failed the substantial evidence test. And third, by interpreting the city's passive non-objection to BPA's immaterial breaches in 1993 and 1995 as a definitive acceptance of BPA's contract price adjustment, notwithstanding the waiver of default clause in the agreements, it read that clause right out of the agreements. Thank you. Thank you, Mr. Williams. Mr. Dinser. Thank you, Your Honor. May it please the Court. Petitioner's appeal is based on a twisted reading of the contract language and an unsupported reweighing of the facts. Going directly to the count one, the bundling count, the single most important thing for the Court to understand is that the petitioners, the cities, do not pay the PF rates. So the question about whether there are charges that are removed or added to the PF rates, they're not paying them. All the PF rates are used for is a ratio, a multiplier, to multiply by the rates that the petitioners actually do pay. This ratio consists of the old PF rates compared to the new PF rates. That way, if the PF rates go up, it creates a positive number, a number greater than one, and the city's rates go up. If the PF rates over time go down, the reverse happens. The important thing, perhaps, here is that at the time of the contract, PF rate included transmission charges, for instance, right? Yes, Your Honor.  Absolutely, Your Honor. And the fact that later on transmission charges get pulled out doesn't change the meaning of PF rate at the time of the contract, does it? Absolutely, Your Honor, and the intent of the parties. If you create this ratio where one number has a different package of products than the other number, what you end up with, as the board found, is an arbitrary result. As the board put it, it makes no sense. You have to keep the same package of goods in the top and bottom of the ratio, or it doesn't mean anything. And so all BPA did was recreate that initial ratio, Your Honor, that initial PF rate. But it doesn't say that in the contract, does it? It doesn't. What the board found was that neither party expected this unbundling, so it was unanticipated. But the board recognized that the primary object of contract interpretation is to give meaning to the original party's intent. And their original intent was to compare this set of goods, compare it over time with the same set of goods. If you compared it without that same set of goods, basically the BPA had two choices. Either they could recreate the PF rate as it originally was by rebundling to create the ratio, or they could create what is, in effect, an arbitrary number. And what the board found was it was nobody's intent to multiply the city's current rate by some arbitrary number to get what would result in an arbitrary rate for the cities. My esteemed colleague suggested that all the petitioners really cared about was the PF number as it was written. They didn't care if they added or subtracted. But that would suggest that there's no reason to bother with this ratio. Just let BPA make up a number if they want to. The reason that the ratio had any validity, any efficacy, was because it was comparing the same set of products over time. But would you think it would have been foreseen by the contract draftsman that the elements contributing to the PF rate could change with time? The board found that it wasn't foreseen by either party. And so I would say no, at that time it wasn't foreseeable that this would happen. But I don't think that in any way suggests an error. I think just at the time they didn't foresee that over time the power buyers would become interested in potentially being able to compare different aspects such as transmission from one potential supplier to another. And so this request and this identification of the need from other people who are buying, who are subject to the PF rate, who actually are subject to it, caused BPA to break these things out so that people could see what the different charges were. This was not a dramatic thing, though. It didn't have an effect on the actual charge that the cities were feeling. And so the intent of the parties at the time of the contract is being given full effect. What was the intent of the parties at that point, though? Wasn't it to really maintain the ratio at a certain rate? Absolutely. So that you have a determination. So what would be the difference if you unbundled versus bundling, just using the unbundled rate as a ratio? If there was an unbundled denominator, then there wouldn't be a difference, Your Honor. But there is no unbundled denominator. The only denominator we have – basically the ratio is what was the previous PF rate that goes on the bottom, what's the new PF rate that goes on the top. Before 1996 there was not an unbundled PF rate. The previous rate was not unbundled. Exactly. So the bottom number has to be bundled because that's the only number we have. So to make this ratio work, the top number just got re-bundled in 1996 so that it would be an apples-to-apples comparison. If in future, 2001 in the future, if the bottom is unbundled and the top is unbundled, then you have an apples-to-apples comparison. But the suit that the court faces right now is from 1996 to 2001. And so during that time, the only way to keep the consistency in this ratio is by re-bundling for the sake of computing this ratio. In 1993 and 1995, the bundled rate – those are the first two times that this ratio was applied. The bundled rate included these transmission costs and the other things as in keeping with the party's original intent. And in 1996, it included the same products. And so the city's suggestion that the paying transmission costs or the transmission costs shouldn't be included under the contract. Well, the transmission costs were part of the original PF rate and were part of this calculation in the earlier iterations when it was applied. Finally, we have what the board found that the city's intended the ratio to track the costs rather than – and that's a factual finding – rather than just be this random use of whatever happens to be in the PF ratio or PF. And so in that sense, it is not a de novo review, but it's a use of discretion. Mr. Williams' argument is really asking us to construe the rate schedule rather than the contract, isn't it? He wants us to look at the rate schedule and see their PF rate in its unbundled form and read that into the contractual term of PF rate, which should include all of the charges that were originally included in the contract as drafted, right? Absolutely, Your Honor, and thereby creating an arbitrary ratio as opposed to one that has a particular meaning. Turning now to the second count, the use of the two separate PF rates. And as the court has recognized, there's clear language in the contract that says if there's more than one PF rate, the average should be determined by a weighting based on forecasted sales under such PF rates. That is clear, unambiguous, and that is exactly what was done. There's no argument that that is what the BPA did in applying the PF rates. There were more than one PF rate. There was the exchange rate and the preference rate, and they simply averaged them. What the petitioner argues is they make several arguments. One is that they had some interpretation that there was only at the time that they signed the contract, there was only the preference rate. But, Your Honors, even if that was true and the board found that it wasn't, but even if that was true, it wouldn't matter. They signed an agreement that said if there are more than one at any time in the future, we're going to average them. Moreover, what they thought at the time they signed the contract really didn't matter because the way that the contract was set up was this. For the first five years of the contract from 88 to 93, none of this ratio or rate was applied at all. Section 9 wasn't applied. What happened was it was an original rate written into the contract with 6% adjustments each year for the first five years. So when the parties signed the agreement, this section was always prospective in the sense that it wasn't going to apply for five more years. So when the term says if there's more than one PF rate, that's because they didn't know five years from now whether there would or would not be more than one PF rate. And so the clear language of the document applies. There's no reason to look beyond the four corners of the document and certainly no reason to look at what the petitioners claimed that they believed back then. Moreover, the board concluded that the city's witnesses, including the witness that my colleague cited, that those witnesses were unpersuasive and uncorroborated. That's the board's decision at 14 and 15. Obviously, that's given great deference. Moreover, the parties' course of dealings is central on this count. 93 and 95, as I said, this PF rate was applied. Most importantly, 93, including both of those, contrary to what council has said, including both of those rates, the exchange and the preference, benefited the cities at the detriment of BPA. It made the city's rate actually lower, including the exchange rate into the calculation. And so... But what difference does that make? Well, we have a course – under Julius and under Blinderman and under just basic contract interpretation, parties' course of dealing over – before there was an argument about the contract, that is given great deference in the interpretation of the agreement. You're saying they had an obligation to complain because their rates had gone down? Not only did they have an obligation to complain, but also it shows that BPA's interpretation wasn't something that had cooked up in 1996. It applied it when it was at its own detriment, and clearly that that was a reasonable interpretation because – or they wouldn't have subjected themselves to it. When the particular – so 93, 95, they had an obligation. Attached to their rate bills was an explanation that their rates were being calculated using both the exchange and preference rates. The information was right there in their hands. They didn't say anything. And the whole idea of the course of dealings analysis is what does that tell us about the contract? And it tells us that both of these rates should be used to calculate the PF rates. Were there any charges that were unbundled or left in the PF rate? Yes, Your Honor. When the PF rate was unbundled, the actual power charges were left in. So the items that counsel suggested, load chafing and delivery, those were taken out, but the actual underlying power charges were left in the PF rate. That's what's the primary mix-up, the PF rate. Now, after the unbundling. If you take out the power charge, there wouldn't be any PF rate left, would there? There's one other term which escapes my mind, but basically it's the charge for the power. Once you take out those, it would just be – in fact, if you did that, let's say hypothetically, they took everything out of the PF rate and you ended up with a 0, you would end up with a ratio eventually of 0 divided by 0 or 0 over some number. So the whole idea of taking things out, they needed to be repackaged in and calculated in the PF ratio for the first count. The – unless the Court has any further questions. Anything for Mr. Dinser? Thank you, Mr. Dinser. Thank you. We request that the Court affirm the holding of the board. Okay. Mr. Cooper, your rebuttal time. Mr. Williams. I'm sorry, Mr. Williams. How much time do I have? Three minutes, okay. I'd like to point out that BPA and the board are arguing that for the strict enforcement of the contract language on count two, but they are arguing to avoid following the clear and unambiguous language of the contract. At the time it was drafted, the meaning of BP rate, the PF rate would have included all the bundled charges, right? You're the one who's asking us to disregard what the contract meant and to read now later the unbundled charges as being outside the contract. I think the contract required precisely all of the charges to be included in the PF rate. That's the way they were when it was drafted, and everyone understood that to be the case. But it didn't say that, Your Honor, and it specifically did – the contract does not define PF power as delivered PF power. There's no concept of delivery in the definition of PF power. When the contract was drafted, and indeed when it was implemented for several years, it was always all of the rates, transmission charges and all of these other things were bundled all together, right? That was the meaning of the term. All that the parties looked at was the PF rate, which had a demand charge and seasonal energy charges. In 1996 for the PF rate – And what did that mean when the contract was drafted? It was full load shaping, load regulations, transmission chargements, adjustments. You didn't even see those in the rate schedule. Of course, and now what you want to do is say, ah, now later we can look at the rate schedule and looky here, we have a PF rate that does not have transmission charges in it. We want to use this new rate schedule to interpret the contract. That's later information. That was not relevant to what PF rate meant at the time of contract drafting, is it? All we're saying is that the PF rate in 1987 – the 1987 rate schedule showed the PF rate was consisting of a demand charge and seasonal energy charge. It didn't say anything about load shaping or load regulation or transmission. But it was all in there. Not really a consideration, Your Honor, because – Because the parties all knew it was in there and they all expected it to be included. That was the meaning of the term. They did not say so in the contract. They just said the PF rate, Bonneville's rate for priority firm power. So when you look at the 1996 rate schedule, it very clearly sets out the rate for priority firm power. Now you found that term that used to mean something different in the contract, and you want to use that term and plug it into the old contract term, but it's a different term. It's just the clear and unambiguous language of the contract. And furthermore, subsection 13C of the contract says each party is going to be responsible for its own transmission costs in the contract. So there really was no understanding that transmission costs would be included in the PF rate. Okay. Thank you, Mr. Williams. Thank you. Thank you, Mr. Dinsifer. The case is taken under submission.